UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Dianna R.[1], | Case No.: 20cv1664-MSB |
| Plaintiff, | |
| v. | **ORDER REGARDING JOINT MOTION FOR JUDICIAL REVIEW [ECF NO. 14]** |
| Kilolo Kijakazi, Acting Commissioner of Social Security, | |
| Defendant. | |

On August 26, 2020, Dianna R. ("Plaintiff") filed a Complaint pursuant to 42 U.S.C.A. § 405(g) seeking judicial review of a decision by the Commissioner of Social Security ("Defendant") denying Plaintiff's application for disability insurance benefits. (ECF No. 1.)  Based on all parties' consent, (see ECF Nos. 3, 5, docket), this case is before the undersigned as presiding judge for all purposes, including entry of final judgment. See 28 U.S.C. § 636(c).

Now pending before the Court is the parties' Joint Motion for Judicial Review. (ECF No. 14.)  The Court has carefully reviewed the parties' Joint Motion [ECF No. 14],

---

[1] Under Civil Local Rule 7.1(e)(6)(b), "[o]pinions by the court in [Social Security cases under 42 U.S.C. § 405(g)] will refer to any non-government parties by using only their first name and last initial."

the Certified Administrative Record ("AR") [ECF No. 8], and the Complaint [ECF No. 1],
and for the reasons set forth below, the Court **ORDERS** that judgment be entered
reversing the decision of the Commissioner and remanding this matter for further
administrative proceedings.

## I.   PROCEDURAL BACKGROUND

On September 23, 2016, [2] Plaintiff filed her second application for disability
insurance benefits, alleging inability to work since June 1, 2012.  (AR 229-35, see also AR
21 (discussing prior application).)  After her application was denied initially and upon
reconsideration, Plaintiff requested a hearing before an Administrative Law Judge
("ALJ").  (AR 144-48, 150-54, 159-60.)  On September 11, 2018, ALJ Robert Iafe held an
administrative hearing, at which Plaintiff testified and was represented by counsel.  (AR
70-93.)  At the hearing, Plaintiff amended the date of onset to February 14, 2015, the
day after an unfavorable hearing decision was entered as to her first claim.  (AR 74.)  A
vocational expert ("VE") later submitted a Vocational Interrogatory at the ALJ's request.
(AR 355-59.)  On September 25, 2019, the ALJ found Plaintiff was not disabled.  (AR 32.)

The ALJ's decision became final on June 20, 2020, when the Appeals Council
denied review.  (AR 1-8.)  On August 26, 2020, Plaintiff filed the instant timely civil
action.  (See ECF No. 1.)

## II.   SUMMARY OF THE ALJ'S FINDINGS

In rendering his decision, the ALJ first established Plaintiff was last insured for
purposes of her claim on December 31, 2017.  (AR 24.)  The ALJ then followed the
Commissioner's familiar five-step sequential evaluation process.  (AR 22-24); see also 20
C.F.R. § 404.1520, 416.920.

---

[2] Although Plaintiff's application records indicate that she filed an application for disability insurance
benefits on September 23, 2016, the ALJ stated that Plaintiff filed an application for disability and
disability insurance benefits on September 12, 2016.  (AR 21.)

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since February 13, 2015, her alleged onset date.  (AR 24.)

At step two, the ALJ found Plaintiff's cervical spondylosis, lumbar degenerative disc disease, and fibromyalgia were severe impairments.  (AR 24-25.)  The ALJ specifically found non-severe Plaintiff's retinal detachment, borderline obesity, anxiety disorder, and depressive disorder.  (Id.)

At step three, the ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Commissioner's Listing of Impairments.  (AR 25-26.)

The ALJ found Plaintiff had the residual functional capacity ("RFC") to do the following:

> perform light work as defined in 20 CFR 404.1567(b)[3] with occasional lifting and/or carrying 20 pounds and frequent lifting and/or carrying of 10 pounds; standing and/or walking for four hours in an eight-hour workday, but for no more than 30 minutes at one time; occasional balancing, stooping, crouching, and climbing ramps and stairs; and never kneeling, crawling, or climbing ladders, ropes, or scaffolds; occasional reaching overhead with bilateral upper extremities; and frequent handling, fingering, and reaching at and below shoulder level.

(AR 26.)

At step four, the ALJ found Plaintiff could not perform her past relevant work as a daycare center teacher.  (AR 30.)

At step five, the ALJ found based on the VE's interrogatory responses that Plaintiff could perform the requirements of a significant number of occupations in the national

---

[3] In the Code of Federal Regulations, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be every little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 CFR 404.1567(b)

1  economy, specifically assembler, solderer, and sorter.  (AR 31-32.)  The ALJ concluded

2  Plaintiff was not disabled as defined by the Social Security Act.  (AR 32.)

### III. DISPUTED ISSUE

4  The parties have identified one issue in their joint motion, which Plaintiff asserts

5  supports reversal:

6  1.  Whether the ALJ erred "in failing to find plaintiff's mental impairment 'severe.'"

7  (ECF No. 14 at 2.)

### IV. STANDARD OF REVIEW

9  Section 405(g) of the Social Security Act allows unsuccessful applicants to seek

10  judicial review of the Commissioner's final decision.  42 U.S.C. § 405(g).  The scope of

11  judicial review is limited, and the denial of benefits will not be disturbed if it is

12  supported by substantial evidence in the record and contains no legal error.  Id.; Molina

13  v. Astrue, 674 F.3d 1104, 1110 (9th Cir. 2012) superseded on other grounds by 20 C.F.R.

14  § 404.1502(a).

15  "Substantial evidence means more than a mere scintilla, but less than a

16  preponderance.  It means such relevant evidence as a reasonable mind might accept as

17  adequate to support a conclusion."  Revels v. Berryhill, 874 F.3d 648, 654 (9th Cir. 2017)

18  (quoting Desrosiers v. Sec'y of Health & Hum. Servs., 846 F.2d 573, 576 (9th Cir. 1988));

19  see also Richardson v. Perales, 402 U.S. 389, 401 (1971).  Where the evidence is

20  susceptible to more than one rational interpretation, an ALJ's decision must be upheld.

21  Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

22  The ALJ's resolution of conflicts and ambiguities in medical evidence is entitled to

23  deference.  See Lewis v. Apfel, 236 F.3d 503, 509 (9th Cir. 2001).  However, even if the

24  reviewing court finds that substantial evidence supports an ALJ's conclusions, the court

25  must set aside the decision if the ALJ failed to apply the proper legal standards in

26  weighing the evidence and reaching his or her decision.  See Batson v. Comm'r of Soc.

27  Sec. Admin., 359 F.3d 1190, 1193 (9th Cir. 2004).

28  / / /

## V.  DISCUSSION

**A.      The ALJ Erred by Finding Plaintiff's Mental Impairments Non-severe.**

Plaintiff, through counsel, specifically identifies one claim of error she believes warrants reversal of the ALJ's finding she was not disabled—the ALJ incorrectly found her mental impairments of anxiety and depression non-severe without the support of substantial evidence.  (ECF No. 14 at 3.)  Specifically, Plaintiff argues that the ALJ improperly rejected "[t]he only medical evidence regarding the severity of Plaintiff's mental impairment[,] the [2018] opinions of Plaintiff's treating psychiatrist, Louis Fontana, M.D., and Plaintiff's treating psychologist, Berenice Ibanez, Ph.D.," and their treatment records from 2014 to 2018, without clear and convincing reasons.  (ECF No. 14 at 4-6.)

The Commissioner argues that Plaintiff failed to meet her burden to provide medical evidence that her mental impairments affected her ability to work while she was still insured, before the end of 2017, and therefore the ALJ properly found Plaintiff's mental impairments not severe.  (Id. at 5-8.)  Instead, the Commissioner claims the ALJ considered all medical evidence and found that the objective evidence regarding Plaintiff's impairments did not support greater functional limitations.  (Id. at 9-12.)

### 1.      Legal standard

At step two, the ALJ determines whether a claimant has a severe impairment or combination of impairments.  20 C.F.R. § 404.1520(a)(4)(ii).  When evaluating whether a claimant has a severe impairment or combination of impairments, the ALJ will assess whether those impairments significantly limit a claimant's ability to perform basic work activities.  Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2005).  "Basic work activities" are defined as "the abilities and aptitudes necessary to do most jobs," and as relevant to mental impairments, include "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting."  20 C.F.R. § 416.922.  If an impairment or combination of impairments does not

significantly affect a claimant's mental or physical ability to do basic work activities, it will be found not severe.  20 C.F.R. § 416.922(a).

Step two functions as a "de minimis screening device to dispose of groundless claims."  Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996).  To find an impairment non-severe, evidence must establish the impairment is "a slight abnormality that has 'no more than a minimal effect on an individual[']s ability to work.'"  Id. (citing SSR 85-28).  The step two analysis is not meant to determine which impairments should be considered when determining a claimant's RFC, or how the ALJ should evaluate the impairments.  Buck v. Berryhill, 869 F.3d 1040, 1048–49 (9th Cir. 2017).  An ALJ's decision that a claimant does not have any severe impairment will only be affirmed where such determination is "clearly established by medical evidence."  Webb, 433 F.3d at 687 (quoting S.S.R. 85-28) (emphasis added).

When evaluating mental impairments at step two, the ALJ must consider four broad categories of functioning which loosely mirror basic work activities, known as the "paragraph B" criteria: "(i) understanding, remembering and applying information; (ii) interacting with others; (iii) concentrating, persisting and maintaining pace; and (iv) adapting or managing oneself."  Salina S. v. Kijakazi, Case No. 1:20-CV-00515-REP, 2022 WL 3700880, at *4 (D. Idaho Aug. 25, 2022) (citing 20 C.F.R. §§ 404.1520a(b)-(c)).  The ALJ must rate the claimant's limitations in each of these categories as none, mild, moderate, marked or extreme, and only if the claimant has mild or no impairments in all four categories is an impairment non-severe.  (Id.)

## 2. Background relevant to mental impairments

When Plaintiff's initial disability report related to the instant claim was submitted over the phone on September 23, 2016, the interviewer indicated that: (a) Plaintiff only alleged disability due to physical limitations, and (b) she had not seen a doctor for mental conditions.  (See AR 263-64, 266, 269.)  Based on this, the Disability Evaluation

1  Analyst submitted a request to San Ysidro Health Center[4] on September 26, 2016,
2  requesting records related to the history, objective clinical findings, diagnosis, and
3  prognosis of Plaintiff's alleged physical impairments.  (AR 390-91.)  The records returned
4  document five office visits with Plaintiff's physician's assistant ("P.A."), Clarissa Castillo,
5  for physical issues from July 29, 2015, to July 22, 2016, and related test results.  (AR 395-
6  433.)  At each visit, Plaintiff's "Chronic Problem List" indicated she had suffered from
7  anxiety since June 3, 2014.  (AR 395, 401, 407, 413, 420.)  Although P.A. Castillo noted at
8  each visit in the "Physical Exam" section that Plaintiff's psychiatric exam was within
9  normal limits, she assessed Plaintiff with depression on November 17, 2015 and April
10  19, 2016, and ordered Plaintiff to continue taking her medication (Cymbalta) and,
11  alternately, to continue seeing her psychologist, engage in positive cognition exercises,
12  and call 911 in case of an emergency.  (Compare AR 398, 404, 410, 416, 423 with AR
13  405, 417.)  In her July 29, 2015 "Review of Systems," P.A. Castillo noted Plaintiff suffered
14  from depression and insomnia.  (AR 423.)

15       Phong T. Dao, D.O. performed the physical consultative examination requested by
16  the Department of Social Services on November 28, 2016.  (AR 468-73.)  One of
17  Plaintiff's four complaints at that examination was "depression and anxiety."  (AR 468.)
18  While Dr. Dao noted that Plaintiff had a history of these conditions for many years, was
19  taking Cymbalta and amitriptyline, was seeing a psychiatrist about every three months,
20  and experienced decreased energy levels, memory, and concentration, he did not
21  review Plaintiff's mental health records, and deferred to the appropriate specialist to
22  render an opinion on Plaintiff's mental health.  (AR 469, 473.)  There is no indication
23  that any mental consultative examination was requested or performed.  (See AR.)

24

25

26

---

27  [4] The Disability Evaluation Analyst also requested records from other providers, but since both of
    Plaintiff's mental health care doctors provided care through San Ysidro Health Center, the Court only
28  discusses this request here.

20cv1664-MSB

1    In Plaintiff's subsequent, January 28, 2017 Disability Report on Appeal, the

2   interviewer only noted that Plaintiff had received additional treatment for her physical

3   impairments, again making no mention of her mental health impairments.  (AR 303.)  It

4   appears that the first time Plaintiff directly alleged her mental impairments contributed

5   to her disability and submitted her mental health treatment records was following the

6   denial of her claim on reconsideration, after she obtained counsel.  (See AR 155,

7   Claimant's Appointment of Representative form, dated April 19, 2017.)  Her attorney

8   first submitted the medical records in Exhibits B10F to B17F between August 7, 2018,

9   and September 5, 2018.  (See AR 500-784 (with fax headers indicating they were

10   provided by the attorney's office on specific dates).)  These records included the

11   voluminous mental health treatment notes and medical opinions that supported her

12   attorney's argument at the September 11, 2018 administrative hearing that her

13   disability was largely impacted by her mental impairments.  (See AR 75-80.)

14    These records include a list of historical results from "screening tools"

15   administered to Plaintiff, indicating Plaintiff was assessed for anxiety and depression at

16   San Ysidro Health Center from at least June 3, 2014, to August 14, 2018, often monthly,

17   and sometimes multiple times in a month.  (AR 532-34.)  More specifically, Plaintiff

18   responded to the PHQ-9[5] on fifty-three occasions, scoring in the severe depression

19   category on thirty-eight of those and in the moderately severe category on eighteen

20   more.  (Id.)  Plaintiff was administered the GAD7[6] anxiety assessment on forty-nine

---

[5] "The Patient Health Questionnaire known as the 'PHQ-9' 'is a[n] instrument fort making criteria-based diagnoses of depressive and other mental disorders commonly encountered in primary care.'" Norman v. Berryhill, Case No. 17-cv-04108-SI, 2018 WL 4519952, at *2 n.3 (N.D. Cal. Sept. 19, 2018) (citing Kurt Kroenke, MD, et al., *The PHQ-9: Validity of a Brief Depression Severity Measure*, 16 J. Gen. Intern. Med. 606 (2001)).  PHQ-9 scores are classified at follows: 0-4 indicates minimal depression; 5-9 mild depression; 10-14 moderate depression; 15-19 moderately severe depression; and 20-27 severe depression.  Salina S. v. Kijakazi, Case No. 1:20-CV-00515-REP, 2022 WL 3700880, at *5 n.4 (D. Idaho Aug. 25, 2022) (citing Kurt Kroenke, MD, et al., *The PHQ-9: Validity of a Brief Depression Severity Measure*, 16 J. Gen. Intern. Med. 606 (2001)).

[6] GAD7 is the Generalized Anxiety Disorder Assessment.  See Gallupe v. Sedgwick Claims Mgmt. Servs., 358 F. Supp. 3d 1183, 1193 (W.D. Wash. Feb. 14, 2019) (discussing GAD7 results in an E.R.I.S.A. case).

occasions and scored in the severe range forty times.  (Id.)  Also laced throughout Plaintiff's mental health records are multiple scores of her Global Assessment of Functioning[7], which was assessed as follows: 60 on June 23, 2016; 70 on September 29, 2016; 50 on January 26, 2017; and 60 on September 7, 2017 and August 14, 2018.  (See AR 749, 741, 704, 638, 531-32.)

Counsel's submission also included the detailed treatment notes from Plaintiff's treating psychologist and psychiatrists for a portion of this time.[8]  These indicate that Berenice Ibanez, Ph.D., Plaintiff's treating psychologist, saw Plaintiff for psychotherapy nineteen times between August 22, 2016, through August 14, 2018.  (See AR 529-34, 535-40, 561-66, 577-82, 601-05, 612-16, 623-27, 636-40, 649-53, 659-63, 669-72, 687-90, 691-94, 699-702, 713-16, 720-23, 736-39, 744-50.)  On all but one of these visits with Dr. Ibanez, Plaintiff reported numerous symptoms of depression and anxiety, including difficulty functioning and concentrating, difficulty falling asleep, anxious and fearful thoughts, and diminished interest and pleasure.  (AR 748, 744, 736, 720, 713, 699, 691, 687, 669, 659, 649, 623, 612, 601, 577, 561, 536, 529.)  Dr. Ibanez consistently noted that Plaintiff's depression was associated with her chronic pain caused by fibromyalgia and headaches and aggravated by conflict or stress.  (Id.)

---

The GAD7, developed in primary care, is an anxiety measure based on seven items which are scored from zero to three, with scores 15 and above indicating severe anxiety symptoms, 10-14 indicating moderate symptoms, and 5 to 9 indicating mild symptoms.  Kurt Kroenke, M.D., et al., *Anxiety Disorders in Primary Care: Prevalence, Impairment, Comorbidity, and Detection*. Annals of Internal Medicine vol. 146,5 (2007): 317-25.

[7] "A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." Garrison v. Colvin, 759 F.3d 995, 1003 n.4 (9th Cir. 2014) (quoting Vargas v. Lambert, 159 F.3d 1161, 1164 n.2 (9th Cir. 1998).  GAF scores are not determinative of disability, they can be a useful measure.  Id.  GAF scores between 41 and 50 describe "any serious impairment in social, occupational, or school functioning," while scores from 51 to 60 indicate moderate difficulty in those areas.  Id. (quoting DSM IV).

[8] These records do not appear exhaustive, considering the assessment history described above and the indication that the August 22, 2016 visit is a follow up for continuing depression symptoms.  (See AR 748.)

1    Between August 2016 and January 2017, Dr. Ibanez generally assessed Plaintiff

2    with symptomatic depressive disorder.  (AR 714, 721, 737, 745, 749.)  From February

3    2017 to June 2017, Dr. Ibanez generally assessed Plaintiff's depressive disorder as major,

4    recurrent, severe, and symptomatic.  (AR 700, 692, 688, 670, 661.)  Dr. Ibanez indicated

5    that Plaintiff's major depressive disorder improved to some degree in August and

6    September of 2017, when alternative therapies provided some pain relief.  (AR 637,

7    650-51.)  In November of 2017, Plaintiff reported making mistakes and missing

8    appointments, which made her worry about her memory and attention.  (AR 625.)  In

9    December 2017, Dr. Ibanez stated Plaintiff "presented as overwhelmed by the daily

10   demands of her children, welfare documentation, and her [appointments with]

11   doctors."  (AR 613.)  From January to August 2018, Dr. Ibanez consistently assessed

12   Plaintiff with either anxiety, depressive order, or both.  (AR 603, 579, 563, 531, 537.)

13   On August 16, 2018, Dr. Ibanez completed a Mental Residual Functional Capacity

14   Assessment for Plaintiff.  (AR 776-79.)  While Dr. Ibanez indicated Plaintiff had only

15   moderate limitations that permitted her to function satisfactorily in several areas, she

16   also found "marked" limitation that substantially decreased effective functioning in

17   other categories, including her abilities to: (a) understand, remember and carry our

18   detailed instructions; (b) maintain attention and concentration for extended periods,

19   perform within a schedule with acceptable punctuality and regular attendance; (c) work

20   with others without distracting them or being distracted by them; (d) accept instruction

21   and criticism; (e) maintain socially appropriate behavior and cleanliness; (f) be aware of

22   and respond to normal hazards; (g) travel in unfamiliar places; and (h) set realistic goals

23   and make plans independently of others.  (Id.)  She further explained that Plaintiff's

24   "ability to function depends on level of pain due to fibromyalgia and it affects her

25   attention and concentration[,] mental status [and] mood."  (AR 778.)

26   From September 29, 2016, to July 6, 2017, Plaintiff saw her treating psychiatrist,

27   Leon Fajerman, M.D., five times for medication management.  (AR 654-58, 664-68, 695-

28   98, 703-06, 740-43.)  From other San Ysidro Health Center records, it appears that

1   Plaintiff was taking Cymbalta in 2016 to treat her depression.  (See, e.g., AR 405

2   (assessing depressive disorder and noting that Plaintiff intended to continue counseling

3   and taking her Cymbalta).)  In September 2016, Dr. Fajerman assessed Plaintiff with

4   "major depressive disorder, recurrent severe without psychotic features," and noted

5   Plaintiff reported adequate effects from her medications.  (AR 741.)  In January 2017,

6   Dr. Fajerman assessed the same diagnosis, and made no changes to Plaintiff's

7   medication.  (AR 704.)  Dr. Fajerman continued Plaintiff's medication and assessed her

8   with "anxiety, improved," in February 2017.  (AR 696.)  However, in June 2017, Dr.

9   Fajerman stated that Plaintiff was "suffering with increase in depressive symptoms with

10  anxiety.  Dysfunctional at home and no response to meds."  (AR 666.)  In response,

11  Plaintiff consented to a trial change to Paxil and Remeron.  (Id.)  In July 2017, Plaintiff

12  reported good levels of relief and Dr. Fajerman did not change her medications.  (AR

13  656.)

14          After Dr. Fajerman left San Ysidro Health Center, Plaintiff began to see a new

15  psychiatrist for medication management, Louis A. Fontana, M.D.  (See AR 76-77

16  (Plaintiff's counsel explaining that Plaintiff's new psychiatrist submitted a medical

17  source statement after her old psychiatrist lost his license); see also AR 631-35.)  Dr.

18  Fontana saw Plaintiff in October 2017, noted she was "somewhat dysphoric," assessed

19  her with depression with anxiety, and planned to transition Plaintiff from Remeron back

20  to Cymbalta.  (AR 633.)  In December 2017, Plaintiff reported that she had a

21  fibromyalgia crisis, and Cymbalta lessened the depression and anxiety.  (AR 606.)  Dr.

22  Fontana assessed anxiety, planned to continue, and possibly increase her Cymbalta, and

23  to taper and discontinue Remeron, if possible.  (AR 608.)  The following month, after

24  noting Plaintiff's mood was "okay," Dr. Fontana continued her Cymbalta at the same

25  dose and gave Plaintiff Remeron with a plan to taper and discontinue it.  (AR 597.)  After

26  an uneventful visit in March 2018, Dr. Fontana noted in June 2018 that Plaintiff was no

27  longer using Remeron, and she was feeling better with Cymbalta in 60 and 30 mg.  (AR

28  541.)  He noted Plaintiff was mainly euthymic with a full affect, though she was tearful

1    when discussing certain topics.  (Id.)  At this point, Dr. Fontana determined to transfer

2    her back to her primary doctor for care.  (AR 548.)

3         Dr. Fontana also completed a Mental Residual Functional Capacity Assessment on

4    August 21, 2018.  (AR 781-84.)  He found Plaintiff less limited than Dr. Ibanez had,

5    though he still found she had some limitations and agreed with Dr. Ibanez that Plaintiff

6    had substantial losses in: (a) "the ability to perform activities within a schedule,

7    maintain regular attendance, and be punctual within ordinary tolerances"; and (b) "the

8    ability to complete a normal workday and workweek without interruptions from

9    psychologically based symptoms and to perform at a consistent pace without an

10   unreasonable number and length of rest periods."  (Compare AR 781-82 with AR 776-

11   77.)  Dr. Fontana further explained that Plaintiff is "unable to sustain activity normally."

12   (AR 784.)

13        At the administrative hearing, Plaintiff's counsel focused his argument on how

14   Plaintiff's mental impairments impacted her residual functional capacity.  (See AR 75

15   (counsel focusing on the mental impairments and referencing the "over 100 pages of

16   treating records" and medical source statements he had submitted).)  He noted that the

17   assessment tools consistently showed her depression and anxiety were severe, and that

18   Drs. Ibanez and Fontana both agreed her impairments would interfere with Plaintiff's

19   ability to get through a workday.  (AR 75-79.)

20        The ALJ denied Plaintiff's disability application in a written decision on September

21   25, 2019.  (AR 15-37.)  Although the ALJ found Plaintiff had certain severe physical

22   impairments at step two, He concluded that Plaintiff's "medically determinable mental

23   impairments of anxiety disorder and depressive disorder," were nonsevere.  (See AR 24-

24   25.)  After acknowledging Plaintiff's history of anxiety and depression, the ALJ noted

25   that Plaintiff reported to her consultative examiner in 2016 that she had never been

26   hospitalized due to these conditions, (AR 25 (citing AR 469)), that she reported

27   improvement in her symptoms in February 2017, (AR 25 (citing AR 699)), that her mood

28   was euthymic, her affect full, and her judgment and insight within normal limits in July

1   2018, (AR 25 (citing AR 537)), and her medication helped her depression in April 2018,

2   (AR 25 (citing AR 524)).  The ALJ then recited his findings regarding the B criteria without

3   further explanation, finding Plaintiff had no limitations in (a) understanding,

4   remembering, or applying information, (b) interacting with others, and (c) adapting or

5   managing oneself.  (AR 25.)  He determined Plaintiff was mildly limited in concentrating,

6   persisting, or maintaining pace.  (Id.)  These observations, the ALJ concluded, rendered

7   Plaintiff's mental impairments nonsevere.  When crafting Plaintiff's RFC, the ALJ briefly

8   discussed the mental RFC opinions of Drs. Ibanez and Fontana, as well as Plaintiff's GAF

9   scores before reiterating that Plaintiff's mental impairments were not severe and

10  excluding any mental limitations from the RFC.  (AR 29-30.)

11          **3.    Analysis**

12          The Court finds the ALJ's finding that Plaintiff's mental impairments were not

13  severe was not supported by substantial evidence.  The relevant question when

14  reviewing the ALJ's step-two severity finding is whether "the medical evidence clearly

15  established that [the claimant] did not have a medically severe impairment or

16  combination of impairments."  Webb, 433 F.3d at 687.  The only evidence discussed by

17  the ALJ regarding the severity of Plaintiff's mental impairments was the Plaintiff's

18  mental health treatment records and the opinions of her treating doctors, which both

19  indicate Plaintiff's mental impairments were severe.

20          Significantly, both of Plaintiff's long-standing mental healthcare providers opined

21  that Plaintiff had substantial losses in her ability to perform activities within a schedule,

22  maintain regular attendance, be punctual within ordinary tolerances, and complete a

23  normal work schedule without issue.  (AR 781-82, 776-77.)  Though Respondent claims

24  these opinions were contradicted by the agency consultants at the initial and

25  reconsideration levels, (ECF No. 14 at 12), those determinations did address Plaintiff's

26  mental RFC because the agency consultants only considered physical impairments.  (See

27  AR 124-28 and 137-40.)  As detailed earlier in this opinion, at the time of the agency

28  determinations, Plaintiff had not yet alleged any mental health impairment, submitted

1   mental health treatment records, or undergone a consultative examination of her

2   mental health.  (See AR 118-43) see also Beecher v. Heckler, 756 F.2d 693, 695 (9th Cir.

3   1985) ([B]ecause the reports of [certain doctors] considered [only] physical

4   impairments, whereas [another] report took into account psychological problems as

5   well, 'we cannot conclude that the opinions conflict, but only that they are not drawn

6   from the same facts.'") (quoting Dressel v. Califano, 558 F.2d 508 n.6 (8th Cir. 1977));

7   Tadesse v. Kijakazi, No. 20-16064, 2021 WL 5600149, at *1 (9th Cir. Nov. 30, 2021)

8   (unpublished) (finding a treating mental health doctor's opinion regarding mental

9   function could not be juxtaposed against state examiner's evaluation of physical

10   function).

11       To the extent Respondent suggests the opinions of Drs. Ibanez and Fontana

12   rendered in 2018 are not relevant to Plaintiff's impairments before December 31, 2017

13   (when Plaintiff was last insured), (see ECF No. 14 at 7-8), the Court first notes that the

14   opinions do not explicitly state when Plaintiff's limitations began.  (AR 776-84.)  Next,

15   the ALJ did not claim to discount them based on the date they were issued.  (See AR 25-

16   30); Luther v. Berryhill, 891 F.3d 872, 875 (9th Cir. 2018) ("A reviewing court may only

17   consider the reasons provided by the ALJ in the disability determination and 'may not

18   affirm the ALJ on a ground upon which he did not rely.'") (quoting Garrison v. Colvin,

19   759 F.3d 995, 1010 (9th Cir. 2014)).  Finally, failure to consider opinions rendered after

20   the date last insured is error.  See Norman v. Berryhill, Case No. 1-cv-04108-SI, 2018 WL

21   4519952, at *15 (N.D. Cal. Sept. 19, 2018) (finding ALJ erred by failing to consider

22   medical opinion after date last insured where plaintiff was diagnosed with depression

23   and anxiety disorder prior to her last insured date, her symptoms grew worse over time,

24   and plaintiff's depression could have been disabling before it was diagnosed as such).

25       These opinions were supported by the entire mental health treatment record on

26   which the opinions were based, and which include further opinions.  See Marsh v.

27   Colvin, 792 F.3d 1170, 1172 n.1 (approving determination that clinical progress notes

28   were medical opinions).  As described in detail above, Plaintiff's San Ysidro Health

1   Center Treatment records demonstrate that she received routine mental health

2   treatment and medication for her depression and anxiety from before August 2016 to at

3   least August of 2018.  Throughout this time, Plaintiff frequently reported difficulty

4   functioning, concentrating, falling asleep, as well as having anxious, fearful thoughts,

5   feelings of guilt, depressed mood, and fatigue.  (AR 748, 744, 736, 720, 713, 699, 691,

6   687, 669, 659, 649, 623, 612, 601, 577, 561, 536, 529.)  The ALJ did not discuss Plaintiff's

7   complaint or diagnoses in his opinion.  (See AR 25-30.)

8          Plaintiff's GAD7, PHQ-9, and GAF scores, also detailed above, all reflect a

9   longstanding struggle with depression and anxiety that impacted Plaintiff's functioning.

10   See Salina S., 2022 WL 3700880, at *8 ("[D]istrict courts have generally treated PHQ-9

11   scores as probative evidence that an ALJ should consider.") (collecting cases); see also

12   Gallupe v. Sedgwick Claims Mgmt. Servs., 358 F. Supp. 3d 1183, 1193 (W.D. Wash. Feb.

13   14, 2019) (finding plan administrator's rejection of PHQ-9 and GAD7 scores without

14   explanation was an abuse of discretion); Garrison, 759 F.3d at 1002-05 (discussing

15   claimant's GAF scores at length as probative evidence regarding his mental

16   impairments); Zaldana v. Astrue, No. 11–7728, 2012 WL 3307007, at *5 (C.D. Cal.

17   Aug.13, 2012) (GAF score of 60, as well as physician's opinions of moderate limitations,

18   indicated a severe mental impairment).  However, the ALJ quickly dismissed Plaintiff's

19   GAF scores as "mere snapshots in time," and he never mentioned Plaintiff's PHQ-9 and

20   GAD7 scores.  (AR 30.)

21          The ALJ's few citations to the record do not overcome the totality of this mental

22   health evidence.  First, the ALJ noted that Plaintiff told consultative examiner Dr. Dao

23   that she had "never been hospitalized for depression or anxiety."  (AR 29.)  But the

24   diagnoses and uncontradicted opinions of Drs. Ibanez and Fontana do not suggest

25   hospitalization was indicated—there is a significant difference between difficulty

26   maintaining a schedule, for instance, and impairment requiring hospitalization.

27   Furthermore, "[f]ailure to seek treatment is not a substantial basis on which to conclude

28   that a claimant's mental impairment is not severe."  Allen v. Comm'r, No. 11–16628,

20cv1664-MSB

2012 WL 5857269, at *2 (9th Cir. Nov.19, 2012).  Lack of hospitalization for a mental impairment is not "clearly established evidence" to support a finding of nonseverity. See Chou v. Astrue, Case No. ED cv12-376-SP, 2012 U.S. Dist. LEXIS 177065, *12 (finding Plaintiff's never having been hospitalized, not taking psychotropic medication, and not receiving ongoing treatment, were not substantial evidence to conclude that Plaintiff's impairments were not severe).  Oddly, the ALJ ignored Dr. Dao's notes that would support a severity finding.  (See AR 28-29.)  Dr. Dao also noted Plaintiff's history of depression and anxiety lasted many years, she was taking medications, and seeing a psychiatrist quarterly.  (AR 469-73.)  She experienced decreased energy levels, concentration, and memory, and Dr. Dao deferred any opinion about her mental RFC to an appropriate specialist.  (See AR 24-30, 469-73.)

Next, the ALJ relied on two incidents when Plaintiff reported improvements in her depression to show that Plaintiff's symptoms improved with treatment and medication.[9] (AR 25 (citing AR 699 and AR 524), AR 29.)  But the fact that a person experienced non-descript "improvement" in symptoms of depression and anxiety does not mean that the person has no functional impairment.  Holohan v. Massanari, 246 F.3d 1195, 1205 (9th Cir. 2001).  "Cycles of improvement and debilitating symptoms are a common occurrence [with mental health issues], and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding claimant is capable of working."  Garrison, 759 F.3d at 1017.

When viewed holistically, Plaintiff's mental health treatment records do not support the ALJ's conclusion that Plaintiff stabilized with treatment.  For instance, on February 3, 2017, the same day Plaintiff reported to Dr. Ibanez that she was

---

[9] Dr. Ibanez' notes from February 3, 2017, indicate Plaintiff reported "improving," specifically that she was sleeping better after receiving a new prescription from Dr. Fajerman.  (AR 699.)  Akther Kotha, M.D., wrote a report of his rheumatology follow-up consult to Plaintiff's Physician's Assistant on April 27, 2018, wherein he noted Plaintiff "has depression and Cymbalta is helping."  (AR 524.)

1    "improving," (AR 699), she also reported that functioning was "extremely difficult," and

2    she still presented with "anxious/fearful thoughts, depressed mood, difficulty

3    concentrating, difficulty falling asleep, diminished interest or pleasure, excessive worry,

4    fatigue, feelings of guilt, loss of appetite and restlessness." (Id.) Her PHQ-9 score

5    indicated severe depression, and her GAD7 score indicated severe anxiety. (AR 701.)

6    Dr. Ibanez assessed Plaintiff with "major depressive disorder, recurrent severe without

7    psychotic features[], recurrent." (AR 700.) The Court notes that Plaintiff's statement

8    about improvement was made after she had been assessed with a GAF of 50 at a

9    medication management appointment with Dr. Fajerman approximately one week prior,

10   indicating serious impairment in social, occupational, or school functioning. (AR 704;)

11   see Garrison, 759 F.3d at 1002 n.4. And at her previous psychotherapy appointment

12   with Dr. Ibanez on January 2, 2017, Plaintiff had reported "increased depression,"

13   frustration that her impairments did not allow her to work, and worry about various

14   challenges in her life. (AR 713.) During the mental status exam, Dr. Ibanez observed

15   Plaintiff's mood was depressed, anxious and irritable, with "overproductive" speech.

16   (AR 714.) Plaintiff's thought content had "preoccupations/ruminations" and was

17   depressive and self-deprecatory. (Id.) In the "cognition" category, Dr. Ibanez noted

18   issues with "attention/concentration" and "erratic/inconsistent memory." (Id.)

19       Not long after the reported February 2017 improvement, Dr. Fajerman noted on

20   June 13, 2017 that Plaintiff was suffering from increased symptoms of depression and

21   anxiety, was dysfunctional at home, and had no response to medications. (AR 666.) To

22   address this, he changed Plaintiff's medications to Paxil and Remeron. (Id.) On June 20,

23   2017, Plaintiff saw Dr. Ibanez for psychotherapy, and reported "a crisis of depression in

24   which she could not tolerate any noise and did not want anyone around her." (AR 660.)

25   Her PHQ-9 score indicated severe depression, and her GAD7 score indicated severe

26   anxiety. (AR 533.) Dr. Ibanez assessed Plaintiff with "major depressive disorder,

27   recurrent severe without psychotic features[], worse." (AR 661.)

28

1      Additionally, though Plaintiff evidently told her rheumatologist that Cymbalta was

2   "helping" her depression on or around April 27, 2018, (AR 524), she again saw her

3   psychologist for depression three days later, on April 30, 2018.  (AR 561-66.)  She

4   reported to Dr. Ibanez that functioning was "very difficult," and presented with multiple

5   depressive symptoms.  (AR 561.)  Dr. Ibanez, in a "review of systems," noted Plaintiff

6   was positive for fatigue, pain, restlessness, change in appetite, difficulty failing asleep,

7   headache, anxiety, difficulty concentrating, feeling down, depressed or hopeless,

8   feelings of guilt, and little interest or pleasure in doing things.  (AR 562.)  A mental status

9   exam noted observations that Plaintiff had a depressed and anxious mood,

10  overproductive speech, preoccupations and ruminations, and issues with attention and

11  concentration.  (AR 563.)  Plaintiff's PHQ-9 score indicated moderately severe

12  depression and her GAD7 score indicated severe anxiety.  (AR 566.)  The mental health

13  treatment records demonstrate that the ALJ here "[r]ather than describ[ing Plaintiff's]

14  symptoms, course of treatment, and bouts of remission, and thereby charting a course

15  of improvement, . . . improperly singled out a few periods of temporary well-being from

16  a sustained period of impairment."  Garrison, 759 F.3d at 1018.

17      Finally, the ALJ noted that in July 2018, Dr. Ibanez observed Plaintiff's "mood was

18  euthymic and her affect was full.  Both her insight and judgment were within normal

19  limits."  (AR 25 (citing AR 537).)  The ALJ's selection of this note is especially perplexing,

20  since the ALJ failed to discuss other findings from the same mental status exam

21  demonstrating Plaintiff's severe mental impairments: Plaintiff's thought content was

22  depressive and had preoccupations and ruminations, while cognitive issues were noted

23  with "attention/concentration," "reading and writing," and "erratic/inconsistent

24  memory."  (AR 537.)  Plaintiff noted she "gets desperate when she finds herself unable

25  to do house chores."  (AR 536.)  Plaintiff's PHQ-9 score indicated severe depression, and

26  her GAD 7 score indicated severe anxiety.  (AR 540.)  The ALJ's lop-sided citation to this

27  record is the kind of "cherry-picking examples from the record where the claimant is

28  experiencing an absence of symptoms" that has been rejected by the Courts.  See

1  Diedrich v. Berryhill, 874 F.3d 634, 642 (9th Cir. 2017) (citing Attmore v. Colvin, 827 F.3d
2  872, 877 (9th Cir. 2016)).

3        In summary, the medical record reflects that Plaintiff regularly complained about
4  significant depressive symptoms, including decreased ability to function and
5  concentrate from at least 2016 to 2018, and her doctors believed her disorders were
6  severe and interfered with her functional ability.  The ALJ erred by failing to
7  acknowledge this mental health treatment history and these opinions, and his resulting
8  determination is not supported by substantial evidence.  See, e.g., Malkin v. Saul, 818 F.
9  App'x 738, 741-42 (9th Cir. 2020) (ALJ's step two finding that claimant lacked any severe
10 impairment was not supported by substantial evidence where for several years, the
11 claimant was regularly treated for mental illness, she was assessed with a GAF score of
12 50, and her treating doctor opined she had a decreased capacity to work); Magwood v.
13 Comm'r of Soc. Sec., 417 F. App'x 130, 132 (3d Cir. 2008) (where claimant presented
14 evidence that she received psychiatric services regularly and therapeutic counseling
15 weekly, took antidepressants, was assessed with a GAF of 55-60, and her treating
16 physician opined she could not work on a sustained basis, such evidence "was more
17 than sufficient" to satisfy the step two threshold).

18        Further, to conclude Plaintiff's mental impairments "did not cause more than
19 minimal limitation in her ability to perform basic mental work activities," (AR 25), the
20 ALJ rejected the uncontradicted mental RFCs from Drs. Ibanez and Fontana.  The
21 treating physician rule then in effect required the ALJ to provide clear and convincing
22 reasons, supported by substantial evidence, for doing so.  See Woods v. Kijakazi, 32
23 F.4th 785, 789–90 (9th Cir. 2022).  An ALJ cannot merely offer conclusions, but must set
24 forth her own interpretations and explain why those interpretations are more correct
25 than the treating doctor's.  Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007).  "[A]n ALJ
26 errs when he rejects a medical opinion or assigns it little weight while doing nothing
27 more than ignoring it, asserting without explanation that another medical opinion is
28 more persuasive, or criticizing it with boilerplate language that fails to offer a

1  substantive basis for his conclusion." <u>Garrison</u>, 759 F.3d at 1012–13 (finding that the

2  ALJ failed to offer specific and legitimate reasons where he largely ignored medical

3  treatment and opinion evidence).

4        The ALJ assigned little weight to Dr. Ibanez' mental RFC:

5        because it is not supported by or consistent with the objective medical
         evidence.  The claimant does not have a moderate or marked mental

6        limitation.  Her mental symptoms and [sic] stabilized with treatment.  She

7        has never been hospitalized for depression or anxiety.  She was cooperative
         at the consultative exam and her hearing demeanor was appropriate.

8

9  (AR 29.)  The ALJ recited identical reasons for assigning little weight to Dr.

10  Fontana's opinion, and added that Plaintiff's daily activities of driving, shopping,

11  and caring for her children suggested a higher level of functioning.  (AR 29-30.)

12        The Court has already addressed the insufficiency of the ALJ's claims that

13  Plaintiff stabilized with treatment and was never hospitalized for her mental

14  health.  The ALJ's claim that the mental health opinions were inconsistent with

15  objective evidence also fails.  When an ALJ discounts a treating physician's

16  opinion because it is inconsistent with the medical record, the ALJ must identify

17  the notes establishing the inconsistency.  <u>See</u> <u>Stewart v. Colvin</u>, 575 F. App'x 775,

18  777 (9th Cir. 2014).  Not only did the ALJ fail to identify specific inconsistencies or

19  cite to any support for his conclusion that Plaintiff is without moderate or marked

20  mental limitation, the ALJ completely overlooked the treating physicians' clinical

21  notes and years' worth of PHQ-9 and GAD7 results.  (<u>See</u> AR 25-30.)  Similarly, the

22  ALJ does not explain how Plaintiff's cooperation at a medical examination or

23  appropriate hearing demeanor conflict with the opined difficulty maintaining a

24  work schedule.

25        Finally, the ALJ's purported conflict with Plaintiff's activities of daily living does

26  not reach the clear and convincing standard.  Though inconsistency between a treating

27  physician's opinion and a plaintiff's daily activities can be a sufficient reason to discount

28  the treating physician's opinion, the ALJ must develop the record with specific detail to

1   demonstrate how the daily activities are inconsistent with the physician's opinion. <u>See</u>

2   <u>Trevizo v. Berryhill</u>, 871 F.3d 664, 676 (9th Cir. 2017). Here, the ALJ did not sufficiently

3   demonstrate such a conflict, particularly where he relied on Plaintiff's testimony for her

4   activities of daily living. (<u>See</u> AR 27.) Plaintiff testified before the ALJ that she received

5   significant help from her mother, husband, and teenaged sons. (AR 88-94.) She said she

6   only occasionally went to the store by herself or drove her children to school, when her

7   pain and medications permitted her to do so safely. (<u>Id.</u>) Her husband went to the store

8   and did the laundry on weekends. (<u>Id.</u>) She stated she "would like to be fine for her

9   kids, but [she couldn't]," and that it was uncomfortable for her kids to touch or hug her.

10   (<u>Id.</u>); <u>see</u> <u>Trevizo</u>, 871 F.3d at 676 ("Absent specific details about [claimant's] childcare

11   responsibilities, those tasks cannot constitute 'substantial evidence' inconsistent with

12   [the treating physician's] informed opinion, and thus the ALJ improperly relied on

13   [claimant's] childcare activities to reject the treating physician opinion."); <u>Martinez v.</u>

14   <u>Berryhill</u>, 721 F. App'x at 599-600 ("And the ALJ cited some evidence that [claimant] was

15   engaged in daily activities, but it appears those activities were largely aspirational and,

16   in any event, the activities do not suggest that [claimant] could function in the

17   workplace.").

18   **B.**   **The ALJ's Step-Two Error Was Not Harmless**

19         An ALJ's error will be harmless if it is inconsequential to the ultimate decision.

20   <u>Basto v. Comm'r of Soc. Sec.</u>, Case No. 2:18cv3140-DMC, 2020 WL 5702242, at *6 (E.D.

21   Cal. Sept. 24, 2020). Assuming the ALJ finds an applicant suffers from at least one

22   severe impairment and continues beyond step two in the five-step analysis, the ALJ

23   must consider limitations caused by all of a claimant's impairments, whether severe or

24   not. <u>Burch v. Barnhart</u>, 400 F.3d 676, 683 (9th Cir. 2005) (citing SSR 96-8p (1996));

25   <u>Carmickle v. Comm'r, Soc. Sec. Admin.</u>, 533 F.3d 1155, 1164 (9th Cir. 2008) (citing SSR

26   96-8p (1996)). "The RFC therefore should be exactly the same regardless of whether

27   certain impairments are considered 'severe' or not." <u>Buck</u>, 869 F.3d at 1049.

28

1        Therefore, any error finding a certain impairment non-severe can only prejudice a

2  claimant if it improperly impacts an ALJ's determination of whether the claimant meets

3        a listing impairment at step three, or the ALJ's determination of the claimant's

4  RFC.  Burch, 400 F.3d at 682.  Otherwise, when an ALJ finds that the claimant meets the

5  step two threshold, any failure to find a specific impairment severe is harmless.  Lewis v.

6  Astrue, 498 F.3d 909, 912 (9th Cir. 2007); see also Groburg v. Astrue, 415 F. App'x 65, 69

7  (10th Cir. 2011) ("An error at step two concerning the severity of a particular

8  impairment is usually harmless when the ALJ, as here, finds another impairment is

9  severe and proceeds to the remaining stapes of the evaluation. . . . The real problem

10  occurs later in the analysis, where the ALJ is required to consider the effect of all

11  medically determinable impairments, severe or not, in calculating the claimant's RFC.").

12        The Court finds that the ALJ erred at step two by finding Plaintiff's depression and

13  anxiety not severe without substantial evidence, and by rejecting the opinions of Drs.

14  Ibanez and Fontana without clear and convincing reasons for doing so.  Because these

15  errors also affected the ALJ's RFC analysis when the ALJ reiterated at the RFC phase that

16  Plaintiff's mental health impairments were not severe and failed to assess any

17  limitations resulting therefrom, the Court cannot say the step two error was harmless.

18  See Tadesse, 2021 WL 5600149, at *1 ("Although an error at step two may be

19  considered harmless where, as here, the ALJ moves to the next step in the analysis, the

20  decision must reflect that the ALJ considered any limitation posed by the impairment at

21  either step four or step five. . . .[T]hat is not the case here."); Salina S., 2022 WL

22  3700880, at *8 (step two errors could not be harmless because the ALJ's treatment of

23  the evidence at step two was flawed and the ALJ did not further consider mental

24  impairments when crafting the RFC);  Basto, 2020 WL 5702242, at *6 (finding that

25  because the ALJ's error finding Plaintiff's headaches not severe affected steps four and

26  five, it was not harmless).

27  ///

28  ///

# VI.  CONCLUSION

The reviewing court may enter a "judgment affirming, modifying, or reversing" the Commissioner's decision.  42 U.S.C. § 405(g).  The reviewing court may also remand the case to the Social Security Administration for further proceedings.  Id.  Whether to remand for further proceedings or award benefits is within the discretion of the Court.  See Salvador v. Sullivan, 917 F.2d 13, 15 (9th Cir. 1990); McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989).  Remand for further proceedings is warranted where additional administrative proceedings could remedy defects in the decision.  See Kail v. Heckler, 722 F.2d 1496, 1497 (9th Cir. 1984).  Remand for the payment of benefits is appropriate where no useful purpose would be served by further administrative proceedings, where the record has been fully developed, or where remand would unnecessarily delay the receipt of benefits to which the disabled plaintiff is entitled.  See Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986); Bilby v. Schweiker, 762 F.2d 716, 719 (9th Cir. 1985); Kornock v. Harris, 648 F.2d 525, 527 (9th Cir. 1980).

Here, Plaintiff contends that the Court should "reverse and remand for payment of benefits" or in the alternative, remand for further proceedings.  (ECF No. 14 at 14.)  Defendant maintains that if this Court finds the ALJ erred, "the proper remedy would be to remand for further proceedings based on the existing record."  (Id. at 14-15.)  Here, further administrative proceedings are appropriate to remedy the ALJ's errors, consistent with this ruling.  On remand, the ALJ should reevaluate all the mental health evidence, including the opinions of Drs. Ibanez and Fontana to determine whether Plaintiff's mental impairments are severe, and to incorporate any credible limitations arising from Plaintiff's mental impairments, regardless of severity, into the RFC.

/ / /

/ / /

/ / /

/ / /

/ / /

For the foregoing reasons, the Court **ORDERS** that Judgment be entered **reversing** the ALJ's decision and **remanding** this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).  The Clerk shall enter judgment accordingly and **terminate** this case.

**IT IS SO ORDERED.**

Dated:  September 30, 2022

Honorable Michael S. Berg
United States Magistrate Judge

20cv1664-MSB